We move to the third case this morning, Arroyo v. Volvo. Good morning, Your Honors. John D. Rose and Caitlin D. Rose on behalf of Ms. Arroyo. Your Honor, this is a case that comes to you on a glance of summary judgment from the courts of law. My client was a veteran of the Iraq War and in 2005 she was employed by Volvo Truck Company North America. Counsel, it's not in your brief and probably doesn't really make any difference, but what rank and what duties does she have? She got up to a sergeant. She is a sergeant now. Her duties, I believe, Your Honor, were in human resources at one point. She was over in Iraq and I don't think she saw, like I never did, any actual bullets when I was... She was in the theater. Well, she was and she heard the... I'm just curious what her occupation was. Human resources, you thought. You know, Judge, that's what I remember her telling me, but it is in the brief because I never... It really doesn't make any difference, so I'm just curious. Thank you. All right, Judge. And Your Honors, this is a case that is built on the emails that we find years later from the supervisors, starting from Mr. Schroeder. Everybody agrees she always did her job. She did her job to their satisfaction. She wasn't fired for that. She wasn't fired because she was disrespectful or insubordinate to Mr. Schroeder. She wasn't even fired because she parked in the back of the building, which becomes a brouhaha at the end of her employment after six years. She was only fired for failure to follow their start of work rule. And the answer to that is this is so frustrating for anyone to even consider that that could be a reason for terminating a lady who was diagnosed by both the employer's independent medical examiner and by her own doctor suffering from PTSD, a lady who said, Mr. Schroeder, I'm afraid. I don't know why I shouldn't be afraid. I'm reliving the stuff going on in Iraq. I'm reliving all the problems I'm having in my office. She doesn't even know what the problems are at work, but we find it from the emails. They're ridiculing her. They're laughing at her. She brings some rules, the law from USERA, and the boss says, I don't have time to read this. Here, Mr. Schroeder, she asked me to give it to you. She's really getting to be a pain in the neck. She tells me it's the law. So when she voluntarily checks into the hospital because she thinks she's going over the deep end, what do they do? They start laughing about she's on vacation in Hawaii. Your Honor, the court said that these emails are just showing that the employer is trying to follow, make sure he's not violating USERA and that he's not violating ADA. Now, Mr. DeRose, I understand at your position that basically this whole issue of her being tardy and her attendance issues were not sufficient to warrant her being terminated. But do you dispute what Volvo says in terms of the times that she was late or that she didn't come to work? Absolutely, Your Honor. Their own records show she checks in 30 minutes early every day to use a meditation room, which they gave her as an accommodation. So she's in the room and, Your Honor, there's no doubt she's on site 30 minutes early. Nobody ever doubts that in the case. But they say she parked in the rear of the building and went around to the front and then she was one to three minutes late in actually starting work. Your Honor, I wish I could say my people in my office were one to three minutes late. That's just ridiculous in this case. She said, I'll work overtime if you want. She's got to come out of the meditation that she's learning so that she can cope with the world. And this was just what it shows throughout. HR admits, well, she's an exceptional case. We may be in violation of the ADA. The other supervisor, Mr. Olin, out at North Carolina says, well, you know, we try to apply our rules fairly. But an outsider might disagree with being one minute late. Now this whole safety shoe policy and she started parking then in the back, I think, right, so that she could not have that issue. And then the rule changed about parking in the back. And did that make it more difficult for her to get to the meditation room? Right. The meditation room was in the back, Your Honor. She said, can I use a room in the front then? They said, no, because we might have conferences. You've got to use a room in the back. So she's using the room in the back. She hears the bell. She immediately pulls her car around to the front and walks to her workstation. And she tells us in her depth, other people aren't even starting work in one to three minutes from the bell. And she said, I'll stay as long as you want me to do afterwards, Judge. But the biggest problem with these emails is they show the hostility and the hatred towards her because they don't have control over her. They weren't only mad because she's one to three minutes late. Mr. Schroeder from 2005 on has threatened to terminate her three or four times in emails. And the people tell us, oh, you can't. You've got to give her time to travel back from Fort Benning, Georgia and have eight hours sleep. So he couldn't terminate her then. And then in 2007, he tries to fire her again. And they say, unfortunately, you have to wait until she comes back from the theater for six full months. She's got six months to make up her mind after facing war. And he says, I have issues with her lack of communication to me in 2008 in November and 2009 in March. She's over in Iraq. She's watching her friends come back in a very bad situation. She's hearing bombs over her head. She's not keeping in touch with them. She's got a little different jobs to do. And he agrees. They don't need her. She's not an indispensable employee. They've got 75 to 90 employees at any one time. All they have to do is just let a soldier go be a soldier and take the chances that we are all so happy that they're doing for us. Counsel, just an aside, you said that Volvo had indicated they didn't treat her any different than any other employee. And then you pointed out that, did they make an admission that there is no other Reservist or National Guard employee in the company? They did, Your Honor. Throughout the entire company? Throughout the entire company. That's half a million people? Yes, Your Honor. One Reservist and one National Guard employee? It's the same person. She's a Reservist. Right, but I mean... Yes. Judge, but it isn't that so much as when you see what he's saying between the lines... Well, that speaks to me something, I would say. Yes. And Judge, the other thing that's important, every time they take action and Mr. Schroeder tries to take discipline of her, and he tries three times, it's always because of something she's done. Finally, in August, she goes and she said, Mr. Schroeder, following her chain of command, as she's taught to do, she said, Mr. Schroeder, you're threatening me. I'm afraid. And what does he do for the first time? He now imposes, two days later, the three-day suspension for being one minute late in getting to her station. And when we look at November of 2010, when they're about to fire her, the kind of statements he makes, well, we can't make it look like we're changing the rules about parking in the rear. Everybody knows that management parks back there, and so do some of the second shift people. So we can't make it look like we're singling her out. He then sends another email to HR down in North Carolina saying, just as I suspected, she walked into me and she asked me, am I being singled out for this parking rule? And he says, well, I haven't published it yet. Management knows about it, but here's what I'm going to put out tomorrow about no parking in rear. Exactly, she's caught on to what they're doing, and she's asked ESGR, please help me with this, ma'am. I want to work for my money. I want an honest day's work and an honest day's pay. I want everything the law allows me to have. And I do not want to be punished because I asked to exercise the rights. And now we find out not only is she being punished, she's being mocked. She asked for disability awareness for the people in the company who are laughing and telling rumors about her. That the court never even gave me a chance. You're in your rebuttal. I'm in my rebuttal now? I thought I'd get a red to stop. I'm sorry. I stopped. If you have any more. Thank you, counsel. Good morning, Your Honors. May it please the court. Fallon Wrigley here for Defendant Appellee Volvo. Before I get into my argument, I'd just like to state that there is a lengthy factual history in this case that was meticulously detailed before the district court and on appeal. And there have been several gross mischaracterizations of the record, and I will attempt to address those throughout my argument. But for starters, the only thing that Volvo admitted is that there were no other active duty reservists at the distribution center, which has a few hundred employees, at the time of Ms. Arroyo's employment. In fact, Mr. Timko, who administered the policy and was one of the individuals who wrote Arroyo up consistently throughout her employment, is a former reservist and worked as a reservist at this distribution center. Who is that? Michael Timko, Your Honor. And he's the? He was her supervisor, Your Honor. Her supervisor? Yes, correct. So as an initial matter and is set forth in our appellee brief, Defendant Volvo contends that Ms. Arroyo's appeal should be dismissed and summary judgment affirmed. On all counts, as she failed to certain the articulable basis for reversing summary judgment as to any of her claims. So, in other words... Before we get away from this thing, that's the reason I asked your opponent about whether it was just that location or the entire company. How can that be misinterpreted? What did you admit to? They only admitted to the distribution center having the employees who were not active reservists. Did they say that? I am happy to review that afterwards and send you a paragraph if I may, Your Honor, but I am certain that that is the case. You don't have a recollection of it? I do not, Your Honor. Let us know what the area was. Certainly. So, in other words, plaintiff failed to state how any of the assertions in her appellate brief actually support reversal of summary judgment. But what was the precise reason she was terminated? Was it for the attendance issue? Correct, Your Honor. The sole reason for her termination was her repeated violations of Volvo's written and objective attendance policy. She continues to state that Arroyo was terminated for violation of the shift start rule, but that is such an incomplete picture of what actually happened. The reality is that she was terminated following a long history of tardiness. Under Volvo's written policy, you would basically need to have four tardies within a four-week period or ten tardies within a six-month period in order to achieve the first level of progressive discipline. There are four levels of progressive discipline, so it's possible that someone would need to be tardy 40 times over the preceding two years in order to actually reach the level of termination. And were there any other similarly situated employees at Volvo that were fired for the same reason? Yes, Your Honor. As an initial matter, plaintiff failed to allege to the district court that similarly situated employees were treated any differently, such that he waives that argument. She actually stated that, again, it's possible that sometimes plaintiffs just cannot identify similarly situated employees. We nonetheless attempted to address that in our appellate briefing. Well, there weren't any, as you indicated, at least in that plant or that facility, there were no similarly situated employees. Correct, Your Honor. So it's hard for you to say that you treated there as similarly situated employees when there aren't. Well, there were no other employees who were active duty reservists at that facility at the time. However, all of the employees at Volvo were subject to this same attendance policy. And other employees did receive occurrences under that policy, and as we set out in our appellate brief... There were emails back and forth between that facility and the human relations people in your headquarters that indicated a little skepticism or other less favorable comments. I would note, Your Honor, that those emails date back to 2008, and I think even giving them the broadest brush, they at most expressed frustration. I think just reading the emails, I don't know that a reasonable juror could find that they indicate any discriminatory animus whatsoever. You mean the PTS, Post Traumatic Stress Disorder, with the six exclamation points behind how long the pamphlet was, 29 pages? Yes, and I think at most that could express frustration, and that's not enough to establish circumstantial evidence. But more than that, Your Honor, and I think this is what the most important point is here, she never received any discipline in following up on those discussions. The only discipline she was received was for violation of an objective attendance policy. Wouldn't this have been better to go to a trial? I don't think so, Your Honor. Again, there are a number of claims at issue here. And I think at most, the argument she is continually making is that the emails exchanged by Volvo's employees and management evince a convincing mosaic of circumstantial evidence. But at the end of the day, Volvo never disciplined her in connection with any of those emails, or her absences due to military leave, counseling, or her PTSD treatment. What is overlooked is that, to the contrary, Volvo made exceptions to its attendance policy, but just for email. There would have been some action taken if the guy in Joliet had carried out it without contacting his superior on the East Coast, wouldn't it? No, I don't think that we can say that, Your Honor. I think that that would be speculative, and at the end of the day, there wasn't discipline. Well, if it was a jury, it would be a jury question, right? I don't think it would even get to that point, Your Honor, or needs to. Now, why did Volvo change its safety shoe policy and parking rule? When you look at the timing of these changes, they suggest that they were implemented to perhaps hinder her ability to take advantage of the accommodations she had been given. Because that meditation room was in the back, the parking was in the back. I think, to the contrary, it reflects that Ms. Arroyo was trying to take advantage of the accommodation. This is a factory facility. All of the parking is actually in the front of the building. The only offices at the front are the corporate administration offices. Ms. Arroyo's, when you walk through the front door, there is a large factory. You walk through the back, and there are private offices in the back. The reason her meditation room was in the back of the factory is because it was the only private location with a closeable door. There is an exit through the back. However, again, this is a shipping facility. What we have on the back are dock doors with over-the-road trucks that are coming and going throughout the day. Volvo had always had a policy discouraging individuals and actually prohibiting them from parking in the back of the building. They didn't have a written policy because it wasn't consistently an issue. When Ms. Arroyo started parking in the back, they realized that they needed to clarify that policy, and I would just note that they made it clear to her, Ms. Arroyo, you're no longer going to be able to park in the back of the building. It took her far more time to park in the back of the building than it would have to park in the front and walk to and from the factory floor. In the meditation room. Correct. Now, she filed a harassment complaint in September of 2011 against Mr. Schroeder. Was that ever investigated? The company attempted to investigate it. However, Ms. Arroyo refused to participate in that investigation. As we set out in detail in our briefs. So there was nothing else done after she refused? Correct, because at that time, based on the timing, she was already terminated. They attempted to follow up with her. They attempted to interview her. They attempted to consolidate the process by giving her a simplistic form to complete, and she failed to do so. In this case. So it was her failure to fill out the form that constituted a refusal to participate? It was, she refused, she stated in emails that are part of this record. When she was initially contacted, she stated I need to speak with my attorney. She then was asked specific questions that she refused to answer. She stated in an email that she would not answer any questions without her attorney. The company had plans to come on site and complete its harassment investigation. She asked, did she ask the company to contact her attorney? Your Honor, standing here today, I can't recall. I don't believe so. Well, let me put it another way. Did the company contact her attorney? Your Honor, standing here today, I'm not certain. All right. Thank you. Around the time of her termination, Volvo made multiple exceptions for Arroyo. For instance, it excused 11 parties in September 2011. This is a mere two months before she was terminated. She was late between five minutes and two hours. And yet, because though the parties had agreed that Ms. Arroyo would arrive two hours late because she was attending PTSD appointments, though she was five minutes to two hours late on 11 Tuesdays in a three-month period, the company chose not to discipline her for those. I think, frankly, if we look at the record as a whole, and if we accept plaintiff's contention that the company was attempting to discriminate against her and terminate her for her parties, it went about it in the most backwards and effectual way because the record is replete with instances in which they voluntarily and on their own initiative made exceptions for her benefit. I'm happy to address each of plaintiff's claims in turn. However, I have only a few minutes left. Are there any other specific questions I can address? I don't think so. All right. Thank you, Your Honors. Thank you, Counsel. Mr. DeRose, how much time does he have? You have five minutes, Mr. DeRose. All right, Your Honor. Your Honor, the first question I remember you asking was Mr. Temko, a reservist. He was. Before the Iraq thing even started, he's the one that started it. That's why I put the Casbah cases in there. He's the one who was advising shorter of their rights, not their obligations. And what Mr. Temko was saying is, oh, if you got off on Monday, you finished your work, why are you coming back on Wednesday? She had to go all the way to ESGR, and the company had to go to Washington to find out you got to give them enough time to drive back from Fort Benning. Well, why don't you fly, they asked. She says, I can't afford to fly. A day and a half coming back after going through training at Fort Benning, Georgia, that's a pretty fast ride back from Georgia. Judge, that was just one point. And they said Counsel just talked about an attendance rule. This is not an attendance rule. This is a lateness rule. It's a tardiness rule. He admits she was there every day she was expected to be there. That two hours late, they're talking about the reason why they can't punish her for that. She's at Maywood in Hines Hospital, and she's got to get from Hines Hospital at 4.30 p.m. to Joliet. You just don't know what the traffic's going to be like between those places. They were so worried about, is this elective group therapy? No, it's not elective group therapy. This is required. Well, can't you reschedule it? No, we can't. We've got a lot of GIs who are going through this group therapy. Make a couple of accommodations, would you please, Volvo? And Counsel says, well, I don't know if the attorneys got involved. The attorney got involved even before she got terminated. They were trying to talk. The attorneys were talking. It's all over emails in this case, which Counsel should know about. But they just ignored that because Schroeder said, I've had it. She's gone. And really telling Judge, one hour after, Justice, excuse me, one hour after Ms. Arroyo finally goes all the way to North Carolina and says, I followed my chain of command, but I can't get this man to stop it with me. And what does Mr. Schroeder, Vice President of the company, write within one hour to Schroeder? He says, don't worry about this investigation that I'm telling you about. It's just something we have to do because she filed a complaint. Call me on my cell phone if you want to talk about it. So when I get Mr. Schroeder on the stand, I say, and what did you do to investigate it? We never did anything. And Mr. Schroeder says, nobody ever questioned me one time about this, but the real thing I keep coming back to, those emails, Judge, we didn't know about them all the time that they were going on. But when you read them and you read the timing of them, they just scream at you that they were going to get rid of her any way they could at some point. They tried to fire her four times when she went overseas twice and when she went on her emergency duty. Does that mean I'm finished? No, it does not. We've got some time. Judge, just a couple of things. Her words right after she checked in the hospital, that says I'm done. You have a minute. All right. Judge, she writes, I want to work. I want to be paid for the work that I do. I do not want to be abused. I do not want to be punished for exercising my rights. And I want the benefits and entitlements provided for me by law and the company. And I have called you, Colonel Gorski, because I am tired of fighting. I do not wish to speak to Mr. Schroeder anymore. It says the whole thing, and she doesn't know what's going on in emails all the time. Thank you for your time and your patience. Thank you, counsel. Thanks to both counsel, and the case will be taken under advice.